UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

<u>Dickens Etienne</u>,
     Petitioner

     v.                              Case No. 18-cv-1156-SM
                                         Opinion No. 2020 DNH 184

<u>Michelle Edmark, Warden</u>,
<u>New Hampshire State Prison</u>,
     Respondent

## O R D E R

On January 28, 2004, Dickens Etienne shot an acquaintance, Larry Lemieux, in the back of the head.  Lemieux died instantly. Etienne was tried and convicted of first-degree murder and his conviction was affirmed on appeal to the New Hampshire Supreme Court.  He brings this petition seeking habeas corpus relief from that conviction.  See 28 U.S.C. § 2254.  Respondent moves for summary judgment on both claims advanced in Etienne's petition, asserting that, as a matter of law, he is not entitled to the relief he seeks.  Etienne objects.

For the reasons discussed, respondent's motion for summary judgment is granted and Etienne's amended petition for habeas corpus relief is denied.

## Standard of Review

Since passage of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") and its amendments to 28 U.S.C. § 2254, the power to grant federal habeas relief to a state prisoner with respect to claims adjudicated on the merits in state court has been substantially limited.  A federal court may not disturb a state conviction unless one of two conditions is met.  The first is when the state court's adjudication of the petitioner's federal constitutional claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  A habeas petitioner seeking relief under that provision faces a substantial hurdle since any "determination of a factual issue made by a State court shall be presumed to be correct" and the petitioner must "rebut[] the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

Alternatively, habeas relief may be granted if the state court's resolution of the federal constitutional issues before it "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  The Supreme Court explained the

distinction between decisions that are "contrary to" clearly established federal law, and those that involve an "unreasonable application" of that law as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Williams v. Taylor, 529 U.S. 362, 412-13 (2000).  The Court also noted that an "incorrect" application of federal law is not necessarily an "unreasonable" one.

> [T]he most important point is that an unreasonable application of federal law is different from an incorrect application of federal law . . ..  Under § 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable.

Id. at 410-11 (emphasis in original).  Finally, it probably bears noting that a state court need not rely upon, nor need it even cite, Supreme Court precedent in order to avoid resolving a petitioner's claims in a way that is "contrary to" or involves

an "unreasonable application of" clearly established federal law.  See Early v. Packer, 537 U.S. 3, 8 (2002) ("Avoiding these pitfalls does not require citation of our cases - indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them.") (emphasis in original).

So, to prevail under section 2254(d)(1), the habeas petitioner must demonstrate that "the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  Harrington v. Richter, 562 U.S. 86, 103 (2011).  In short, "Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal."  Id. at 102-03 (citation and internal punctuation omitted).  As the Harrington Court noted, AEDPA's amendments to section 2254(d) present a significant barrier for those seeking habeas relief and impose upon this court a highly deferential standard of review.

> If this standard is difficult to meet, that is because
> it was meant to be.  As amended by AEDPA, § 2254(d)
> stops short of imposing a complete bar on federal-
> court relitigation of claims already rejected in state

> proceedings.  It preserves authority to issue the writ
> in cases where there is no possibility fairminded
> jurists could disagree that the state court's decision
> conflicts with this Court's precedents.  It goes no
> further.

Harrington, 562 U.S. at 102 (citation omitted).

Only as to federal claims that were presented to the state court but neither adjudicated on the merits nor dismissed by operation of a regularly-applied state procedural rule, may this court apply the more petitioner-friendly de novo standard of review.  See, e.g., Clements v. Clarke, 592 F.3d 45 52 (1st Cir. 2010) ("In contrast, a state court decision that does not address the federal claim on the merits falls beyond the ambit of AEDPA.  When presented with such unadjudicated claims, the habeas court reviews them de novo.") (citation omitted).[1]

With those principles in mind, the court turns to Etienne's petition and the State's motion for summary judgment.

---

[1]   It is, perhaps, important to note that "unadjudicated claims" are different from claims that were resolved on the merits, but without any explanation.  See generally Wilson v. Sellers, 138 S.Ct. 1188, 1192 (2018) ("[W]hen the relevant state-court decision on the merits, say, a state supreme court decision, does not come accompanied by [any] reasons . . . . [w]e hold that the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale.) (emphasis supplied). See also Ylst v. Nunnemaker, 501 U.S. 797 (1991).

**Background**

Etienne's habeas corpus petition advances two claims.
First, Etienne asserts that his trial counsel was ineffective
for failing to recognize that he suffered from a mental health
condition and for neglecting to have him undergo a psychiatric
evaluation – something he says likely would have revealed that,
at the time of his trial in 2004, he suffered from a severe
mental illness.  Armed with that information, says Etienne,
trial counsel could have better explained to the jury his
inculpatory post-shooting behavior and/or negotiated a favorable
plea agreement with the State.  In his second claim, Etienne
asserts that the State withheld from him material impeachment
evidence concerning a trial witness – conduct he claims violated
his constitutionally protected right to due process.

The factual backdrop to Etienne's murder conviction is set
forth in detail in the New Hampshire Supreme Court's decision
affirming that conviction.  See State v. Etienne, 163 N.H. 57
(2011).  In brief, the pertinent facts are as follows.  On
January 28 of 2004, Etienne and several other men had gathered
outside an apartment in Manchester, New Hampshire.  Two of those
men – Lemieux and Pierre – began arguing.  Both men (as well as
others, including Etienne) were armed.  According to the New
Hampshire Supreme Court:

Lemieux [the victim] arrived . . . and walked onto the porch with his hands in his pockets.  He approached Pierre so they stood face to face, about six inches apart. . . . the defendant [Etienne] and [others] stood in the area behind Lemieux.  Pierre's gun was in his waistband, and [Etienne's] gun was plainly visible in his hand.

Witness accounts differed as to what was said next.

* * *

The witnesses all agreed that the defendant [Etienne] and Pierre spoke to each other in Haitian Creole, and then the defendant stepped behind Lemieux, raised his gun, and shot Lemieux in the head behind his right ear.  Lemieux's hands were inside his jacket when he was shot.  He died immediately.

After the shooting, the group dispersed.  The defendant, Pierre and Rivera drove toward Massachusetts.  At some point, while they were still in New Hampshire, Pierre got out of the car.  The defendant and Rivera continued to Rivera's brother's home in Brighton, Massachusetts, where the defendant showered and changed his clothes.  He and Rivera then visited the defendant's sister's home, where he gave her a bag of his soiled clothing and spoke with her about being his alibi for the shooting.  He telephoned [another friend] from a Massachusetts number and told her he was at his sister's home in Boston, and that he had heard about what had happened at the apartment. The defendant left his sister's home at 3 p.m., after approximately twenty minutes there, and drove to the Brighton Reservoir where he threw his gun, magazine and bullets onto the ice.

State v. Etienne, 163 N.H. 57, 67 (2011).  Etienne was indicted for the murder of Lemieux.  Despite his earlier denials of any involvement in the shooting, at trial, Etienne claimed to have acted in self-defense, as well as in the defense of another.

Following an eight-day jury trial, Etienne was convicted of
first-degree murder.  He was sentenced to life in prison,
without the possibility of parole.

Etienne appealed to the New Hampshire Supreme Court.  Among
the issues he raised was a claim that the State failed to
disclose impeachment evidence relating to one of the trial
witnesses against him: Jose Gomez.  That impeachment evidence
was a letter from the New Hampshire Attorney General's Office,
recommending that Gomez receive a suspended sentence on state
drug charges unrelated to Etienne's murder case.  The State's
failure to disclose that information, said Etienne, violated his
constitutionally protected right to due process.

The New Hampshire Supreme Court found that the undisclosed
evidence was, indeed, favorable to Etienne.  Nevertheless, the
court concluded, "beyond a reasonable doubt, that the evidence
would not have altered the outcome because even if the
impeachment had caused the jury to disregard Gomez's testimony
altogether, there was overwhelming additional evidence of
premeditation before the jury."  State v. Etienne, 163 N.H. at
92.  Accordingly, the court held that Etienne's rights under
neither the State nor Federal Constitution were violated.

In December of 2012, Etienne filed a motion for new trial in state court (construed as a petition for habeas relief).  In it, he advanced several challenges to his conviction. Approximately two and one-half years later, during the summer of 2015, Etienne was, for the first time, diagnosed with schizophrenia, paranoid type, by a staff psychiatrist at the New Hampshire State Prison.  Although Etienne appears to have been diagnosed with depression following a suicide attempt in his teens, the 2015 diagnosis – nearly 11 years after his first-degree murder trial - was the first time a medical provider reported that he suffered from more serious mental illness.  In the wake of that diagnosis, Etienne amended his state habeas petition to include claims asserting that trial counsel was ineffective for failing to investigate his mental health condition and neglecting to obtain a mental health evaluation.

Subsequently, in the summer of 2017, the state habeas court held a three-day evidentiary hearing on Etienne's petition for a new trial.  Several witnesses appeared and testified, including Etienne's two trial attorneys.  The court also heard testimony from two mental health experts: Dr. Albert Drukteinis, for the petitioner, and Dr. Allison Fife, for the State.  Additionally, Etienne submitted to the court the written "Psychological

Evaluation of Dickens Etienne" prepared by Dr. Drukteinis
(document no. 3-12).

In a detailed and well-reason order, the state habeas court
denied Etienne's petition.  State v. Etienne, No. 216-2004-CR-
1717 (N.H. Sup. Ct. Jan. 23, 2018) (document no. 3-5).  The New
Hampshire Supreme Court declined to accept Etienne's appeal.
Etienne then petitioned this court for relief under 28 U.S.C. §
2254.

## Discussion

In his Amended Petition for Writ of Habeas Corpus (document
no. 28), Etienne advances two claims:

> Claim 1   That he was denied effective assistance of
> counsel when trial counsel failed to
> investigate his mental health records and
> consult with a mental health expert,
> depriving him of non-inculpatory reason for
> his post-incident behavior and/or depriving
> him of an opportunity for a favorable plea
> bargain.

> Claim 2   That his federal constitutional rights were
> violated when the State withheld favorable
> impeachment evidence regarding one of the
> State's key trial witnesses.

Id. at 1 (emphasis supplied).  As noted above, the New Hampshire
Supreme Court considered, and rejected, Claim 2 on direct
appeal.  Six years later, the state habeas court considered, and

rejected, Claim 1 in Etienne's post-conviction proceedings. Those two state court decisions are the focus of Etienne's pending petition.

Parenthetically, the court notes that earlier in these proceedings, the State moved to dismiss Etienne's petition on grounds that it was not filed in a timely manner.  The court denied that motion, without prejudice, concluding that while the arguments raised by the State likely had merit, resolving them (and, more particularly, Etienne's claimed entitlement to equitable tolling based upon mental illness) would require significant time, resources, and effort.  Etienne v. Edmark, 2020 WL 211100, 2020 DNH 008 (D.N.H. Jan. 14, 2020) (document no. 19) at 7-8 ("[I]t is unlikely that the court can resolve the respondent's motion to dismiss solely on the record presently before the court.  Rather, an evidentiary hearing would probably be required, as would the testimony of psychiatric experts (who would, of course, first have to examine Etienne and review more than twenty years of his medical records)").  Consequently, the court concluded that, "a more efficient approach to resolving Etienne's claims would be to bypass the timeliness issue for now in favor of exploring the merits of his claims, returning to the timeliness issue if there appears to be any substantive merit to

his petition." Id. at 8.  The court now turns to the merits of those claims.

I.   Claim One – Ineffective Assistance of Counsel.

In the first of his two claims, Etienne focuses on his schizophrenia diagnosis – made more than ten years after the murder trial – and says his attorneys were ineffective for having neglected to investigate his mental health records and for failing to "discover" his mental illness.  He adds that if counsel had obtained such information, they could have used it: (a) to explain to the jury his inculpatory post-shooting conduct (i.e., flight from the scene; disposal of the murder weapon; lies to the police; and a series of letters written from jail that undermined his claims of self-defense); and/or (b) to negotiate a favorable plea agreement with the State.

To prevail on a claim of ineffective assistance of counsel, a habeas petitioner must show that his or her counsel provided constitutionally deficient representation and that the petitioner suffered actual prejudice as a result.  See Strickland v. Washington, 466 U.S. 668, 687 (1984).  As to each of those essential elements, the petitioner bears a substantial burden of proof:

> To establish <u>deficient performance</u>, a person
> challenging a conviction must show that counsel's
> representation fell below an objective standard of
> reasonableness.  A court considering a claim of
> ineffective assistance must apply a strong presumption
> that counsel's representation was within the
> wide range of reasonable professional assistance.  The
> challenger's burden is to show that counsel made
> errors so serious that counsel was not functioning as
> the 'counsel' guaranteed the defendant by the Sixth
> Amendment.
>
> With respect to <u>prejudice</u>, a challenger must
> demonstrate a reasonable probability that, but for
> counsel's unprofessional errors, the result of the
> proceeding would have been different.  A reasonable
> probability is a probability sufficient to undermine
> confidence in the outcome.  It is not enough to show
> that the errors had some conceivable effect on the
> outcome of the proceeding.  Counsel's errors must be
> so serious as to deprive the defendant of a fair
> trial, a trial whose result is reliable.

<u>Harrington</u>, 131 S.Ct. at 787–88 (citations and internal

punctuation omitted) (emphasis supplied).  Given the foregoing

requirements, "surmounting <u>Strickland's</u> high bar is never an

easy task."  <u>Padilla v. Kentucky</u>, 130 S.Ct. 1473, 1485 (2010).

Etienne has failed to do so.


Etienne does not seem to take serious issue with the habeas

court's application of governing constitutional law (indeed,

there is no suggestion in the record that the habeas court

misunderstood or misapplied that law).  Instead, Etienne

challenges the court's factual findings that:

(a) "reasonably competent trial counsel would not have pursued the evidence [of Etienne's mental health] based on the totality of what was known and the viable defenses [available to them]," State Habeas Decision at 24; and

(b) even if trial counsel could have obtained a "useful" diagnosis of Etienne's mental health condition, "the court does not find there is a reasonable probability that the verdict would have been different." Id. at 28.

In short, the state habeas court concluded that Etienne's attorneys did not provide constitutionally deficient representation and, even if their conduct had fallen short of constitutional minimums, Etienne suffered no prejudice as a result.  Etienne has failed to demonstrate that either of those presumptively-correct findings amounts to an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  See also 28 U.S.C. § 2254(e)(1).  Rather, those conclusions are amply supported by the record.


A.   Counsel was not Ineffective.

By way of background, the court notes the following about Etienne's mental health.  In October of 1995, he was admitted to Faulkner Hospital following an overdose of pills and detergents – an apparent suicide attempt when he was 18 years old.  As the habeas court noted, this was his first and only hospitalization.

The are no records of any prior mental health history.  Hospital
records noted the death of Etienne's father earlier that year,
as well as the accidental death of one of his close friends just
a week earlier.  Treatment focused on his depression, which
seemed related to his personal losses and stress.  He reported
no psychotic symptoms and did not appear psychotic.  He reported
no prior psychiatric admission or outpatient treatment.  Etienne
did, however, reveal to his caregivers a significant criminal
history, which included, among other things, charges for
attempted murder when he was just 13 for his alleged role in a
Haitian gang-related shooting.  The state habeas court noted
those incriminating revelations when explaining why, if
disclosed, such medical records might prove more harmful than
helpful to Etienne.

Two years later, in 1997, Etienne was charged with
attempted murder and first-degree assault arising from a
shooting in Nashua, New Hampshire.  He was tried four times
before eventually securing an acquittal in November of 2001.
The court recounts those multiple criminal trials for this
reason: throughout the numerous and lengthy judicial proceedings
associated with his four criminal trials (and at least one
appeal), Etienne's mental status was never questioned, either in
the context of his competency to stand trial or as a potential

mitigating factor for his alleged conduct.  Similarly, in his criminal trial on witness tampering charges (which <u>followed</u> his 2004 murder trial), no questions concerning his mental health or competency to stand trial were raised.  If Etienne was, as suggested by Dr. Drukteinis, suffering from some sort of "prodromal schizophrenia" when he shot Larry Lemieux in 2004, he concealed its symptoms well from his family, friends, and most importantly, his lawyers.

After conducting the evidentiary hearing, the state habeas court rejected Etienne's claim that his trial attorneys provided constitutionally deficient representation whey they failed to recognize his claimed mental illness in 2004.  The court concluded that trial counsel were not actually aware of any potential mental health issues.  Moreover, because evidence of any potential mental illness at the time was so diffuse and well-concealed, it could not be said that counsel should have recognized that he might be mentally ill.  In support of those conclusions, the habeas court noted, among other things, that:

1.   [Etienne] was diagnosed for the first time with schizophrenia by Paul Brown, MD.  On August 4, 2015, Etienne informed Dr. Brown that he began hearing voices in 2013.  Suffice it to say that his presentation in 2015 was markedly different from what his lawyers described in 2004.  State Habeas Decision at 10.

2.    "The information known to the lawyers that might
      have prompted the collection of records was not
      suggestive of a mental illness that would have
      resulted in a change of strategy or a supplement
      to the defense.  There is no credible argument
      that the shooting was a product of mental illness
      or that Etienne's mental illness impacted his
      mental state at the time of the shooting, nor was
      mitigation an issue."  Id. at 23.


3.    "Landry [trial counsel] had a long-term
      relationship with Etienne during which he gleaned
      no evidence of mental illness.  Mirhashem [co-
      counsel] shared this view, and indicated that he
      was particularly sensitive to raising issues if
      there was anything to note.  The investigator,
      who enjoyed the best relationship with Etienne
      and worked very closely with him due the
      restriction on Etienne keeping his discovery,
      brought no concern to the lawyers about Etienne's
      ability to work on his case or his behavior."
      Id. at 23.

4.    Trial counsel interviewed approximately fifty
      people who knew Etienne, "only one of whom even
      remotely suggested some paranoia, fairly weak
      evidence at that."  Id. at 24.

5.    Etienne's hospitalization for a suicide attempt
      when he was a minor occurred in the context of
      his having been depressed about the death of his
      father.  He did not present with symptoms of
      mental illness.  Additionally, that incident took
      place many years before the events at issue in
      the murder trial.  Id. at 25.

6.    "Of the many lawyers representing Etienne, not
      one has had him evaluated or noted a mental
      health issue, including the lawyer who
      represented him in the witness tampering case in
      2011, the very conduct [i.e., threatening letters
      from jail while awaiting his murder trial]
      Etienne now alleges would have been explained by
      his mental illness."  Id. at 27 (emphasis
      supplied).

    7.    "Although Etienne's [habeas] lawyer culled out every record reference to support a claim that mental illness was the cause of the petitioner's behavior, given the amount of time the records span, from 1995 to the end of 2004, there is little to warrant concern about delusions or paranoia having influenced his behavior pending trial.  The majority of the information points to depression, as was diagnosed in 1995, and there was no evidence that he was experiencing auditory hallucinations in 2004.  <u>The hints of schizophrenia were buried far too deep for the lawyers to have seen them during this period</u>." <u>Id</u>. at 27 (emphasis supplied).

Finally, the court credited the expert testimony of Dr. Fife over that of Dr. Drukteinis.  The court acknowledged Dr. Drukteinis's opinion that "Etienne is currently suffering from schizophrenia as diagnosed by [the prison doctor] and likely was suffering from at least prodromal schizophrenia at the time of the 2004 trial." <u>Id</u>. at 19.  Nevertheless, the court noted that "Dr. Fife did not share Dr. Drukteinis' view." <u>Id</u>. at 20.

Dr. Fife recognized that schizophrenia is progressive and could wax and wane, but she saw <u>no evidence that a psychotic disorder was active at the time of the 2004 trial</u>.  She indicated that it can be difficult to know if a person is concealing symptoms when they do not self-report.  However, from her current interviews with Etienne and the records she reviewed from the period around 2004, Dr. Fife stated that <u>she could not conclude that mental health symptoms were present at the time of trial</u> that would have interfered with Etienne's ability to work with his attorneys.  She noted that the records lack evidence of a contemporaneous mental illness that would explain or attempt to explain the actions Etienne took around 2004.

Id. at 21 (emphasis supplied).  The court found Dr. Fife's testimony and opinions more persuasive than those of Dr. Drukteinis and, as it was entitled to do, relied more heavily upon her testimony.

The state habeas court properly recognized that, "the question is not whether the defense could have found some evidence to support an argument that the petitioner was mentally ill, but rather whether, given what was before the lawyers, a reasonably competent lawyer would have pursued the evidence based on the totality of what was known and the viable defenses."  Id. at 24.  The court answered that question in the negative.  That conclusion, which is amply supported by the record and consistent with Supreme Court precedent, is fatal to Etienne's ineffective assistance claim.  See, e.g., Knight v. Spencer, 447 F.3d 6, 15 (1st Cir. 2006) ("It is only where, given the facts known at the time, counsel's choice was so patently unreasonable that no competent attorney would have made it, that the ineffective assistance prong is satisfied.") (emphasis supplied; citation and internal punctuation omitted).  For that reason, Claim 1 of his petition fails.

B.   <u>Etienne was not Prejudiced</u>.

Despite concluding that Etienne's attorneys did not provide constitutionally deficient representation, the state habeas court went on to consider Etienne's claim that he was prejudiced by his lawyers' failure to investigate his mental condition: that is, his assertion that the result of his murder trial would have been different because, armed with such information, he could have either negotiated a plea agreement with the State or explained to the jury why he engaged in such incriminating post-shooting behavior.

The state habeas court sustainably rejected that claim as well.  Among other things, the court found:

1.   "The court accepts the lawyers' testimony that Etienne never authorized his lawyers to negotiate a plea bargain or expressed a desire to accept one given the likely result of release from prison when Etienne was in his fifties, a daunting thought when there was a reasonable chance of freedom.  This is not a circumstance where the lawyers advised their client to plead guilty and the advice was refused or the client was persisting on going to trial in the face of insurmountable odds.  Rather, the lawyers' and Etienne's evaluations of the case were in line and logically based on what was known when the decision was made.  The fact that Etienne was convicted does not render the assessment of the strengths and weaknesses of the government's case incompetent."  <u>Id.</u> at 33.

2.   "Etienne also alleges that counsel was ineffective for failing to develop background

information with which to negotiate a plea bargain.  However, as discussed above, Etienne never expressed an interest in a plea bargain and never authorized his lawyers to seek one.  He was not a neophyte to the criminal process.  The lawyers evaluated the strength of the State's case with him.  Their efforts were rightly put towards trial preparation, and the court takes no issue with the attorneys' view of this case being a triable one.  There was ample evidence supportive of the defense, which would have resulted in Etienne's freedom had the jury believed it.  In fact, after sitting through the whole trial, as did the jury, Etienne still rejected a plea to manslaughter [which the State offered after closing arguments]."  Id. at 35 (emphasis supplied).

3.   "Had the petitioner been evaluated or mental health concerns been shared, the State would have been privy to all the information contained in the records, good and bad, including the petitioner's early gang involvement, the attempted murder [when he was just 13], the theft, and his prior probationary period.  The negative information contained in the records would likely have outweighed any sympathy that could have been engendered by identifying Etienne as mentally ill.  The court is hard pressed to see how that information would have resulted in more favorable treatment by the State or an acceptable plea bargain."  Id.

As an aside, it is unclear how Etienne believes evidence of his (potential) mental illness in 2004 might have prompted a more favorable offer than the one actually made by the State. Despite having the benefit of knowing all the evidence of his guilt that was presented to the jury, Etienne still rejected the State's offer of a plea to manslaughter.

The court need not belabor the point.  The factual conclusions reached by the habeas court are amply supported by the record.  And, more importantly, Etienne has not shown, by clear and convincing evidence, that the state habeas court's adjudication of his federal constitutional claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  See generally Yeboah-Sefah v. Ficco, 556 F.3d 53, 66 (1st Cir. 2009) ("AEDPA sets out a separate and exacting standard applicable to review of a state court's factual findings.  The state court's factual findings are 'presumed to be correct' unless the petitioner rebuts this 'presumption of correctness' with 'clear and convincing evidence.'") (quoting 28 U.S.C. § 2254(e)(1)).

II.  Claim Two – Exculpatory Evidence.

On direct appeal of his murder conviction, Etienne claimed "that he was denied access to exculpatory information by the State in violation of his due process rights under the United States and New Hampshire Constitution."  Etienne, 163 N.H. at 88.  As noted above, the undisclosed evidence was a letter from the New Hampshire Attorney General's Office, recommending that Jose Gomez (a witness called by the State in Etienne's murder trial) receive a suspended sentence on state drug charges.  Id.

at 87.  It probably bears noting that the proffer letter was not related in any way to Etienne's murder trial or Gomez's expected testimony at that trial; it pertained solely to drug trafficking charges against Gomez and his efforts to reduce his sentence by sharing with the Manchester Police Department his "knowledge of illegal drug activities in the Manchester area."  See Id.

The New Hampshire Supreme Court resolved that claim against Etienne, concluding that although he had shown that the withheld evidence would have been favorable to his defense (to impeach Gomez's credibility), such evidence would not have altered the outcome of the trial:

> We [like the trial court] conclude that the undisclosed evidence would not have altered defense counsel's strategy, which centered on impeachment of Gomez.  We also find, beyond a reasonable doubt, that the evidence would not have altered the outcome because even if the impeachment had caused the jury to disregard Gomez's testimony altogether, there was overwhelming additional evidence of premeditation before the jury.

Id. at 92.  Etienne disagrees and asserts that the New Hampshire Supreme Court deprived him of his constitutional rights when it "found that the new impeachment evidence regarding Gomez was cumulative of other evidence and the State could have proved premeditation without the testimony of Gomez."  Amended Petition at 20-21.  Specifically, he argues that:

The state court's determination of the facts on this
issue is unreasonable because it relies on trial
counsels' <u>attempts</u> to establish that Gomez got a
"deal," while failing to consider the fact that these
attempts <u>failed</u>.  The decision is also an unreasonable
application of the facts, as it fails to consider the
resulting prejudice from the State's vouching for
Gomez's credibility in their closing argument.
Contrary to the state court finding, Gomez's testimony
was unparalleled in supporting the State's argument
that Mr. Etienne committed first degree murder.  Gomez
claimed that prior to the shooting, Mr. Etienne said,
"it's a wrap" and that he was going to "merk" Lemieux
and that these terms meant that Mr. Etienne was going
to kill Lemieux.

Petitioner's Memorandum (document no. 36) at 15.


The court disagrees.  As the New Hampshire Supreme Court

noted, counsel's efforts to impeach Gomez did not "fail."  They

were, in fact, quite successful.  The withheld evidence would

have merely bolstered their impeachment of him.  Moreover, the

New Hampshire Supreme Court did not misapprehend the potential

value of the undisclosed impeachment evidence.  Indeed, it

recognized that:

> The defense strategy included an argument that Gomez
> was not a credible witness because he had, in all
> likelihood, received a "deal" on his drug charges.
> The defense questioned Gomez extensively about his
> belief that he had received no such deal, established
> the actual sentence Gomez received, and attacked the
> sentence by implying that it was inadequate in light
> of Gomez's criminal history and the charges he had
> been facing.  The defense also argued during its
> closing that Gomez's testimony was not credible

> because he had received an insufficient sentence for
> his drug charges and had become part of the
> prosecution's "team."
>
> The proffer letter, if disclosed, would have provided
> evidence that Gomez had attempted to cooperate with
> the State on the unrelated drug charges, and would
> have supported the defendant's assertion that Gomez
> had allegedly joined the prosecution's team.  It would
> not have established that Gomez received any
> consideration for his testimony at the defendant's
> trial.

Etienne, 163 N.H. at 92.  Overall, the court concluded that

counsel's multi-pronged impeachment of Gomez was quite effective

and evidence of his efforts to cooperate in an unrelated case of

his own was only one aspect of that assault on his credibility:

> The defendant challenged Gomez's credibility in
> several additional respects.  Gomez testified while
> wearing his New Hampshire State Prison clothing and
> fielded questions from both parties about the sentence
> he was serving at the time.  He discussed his actions
> with regard to possessing a firearm and hiding
> Lemieux's gun, the charges leading to his
> imprisonment, as well as the lies he had apparently
> told to police on prior occasions.  Gomez's
> cooperation with the State to receive consideration in
> an unrelated case, therefore, was only one of the
> areas in which the defense attempted to discredit him,
> and the remaining avenues of impeachment were
> unaffected by the undisclosed information.

Id. at 92-93 (emphasis supplied).  And, finally, the court found

that, "Gomez's testimony at trial, while providing some evidence

of premeditation, was not the primary, exclusive, or crucial

evidence on that element. . . [M]any witnesses testified to the

events leading up to the homicide, to the circumstances of the homicide, and to the defendant's actions thereafter."  Id. at 93.

Those factual findings are amply supported by the record. While Etienne plainly disagrees with some, if not all, of them, he has not rebutted the presumption of correctness afforded to those findings by clear and convincing evidence.  Necessarily, then, Claim 2 of his petition also fails.

## Conclusion

Etienne's habeas corpus petition is, in essence, an effort to relitigate factual findings that were resolved against him by both the New Hampshire Supreme Court and the state habeas court. Having reviewed the record, as well as the arguments advanced by counsel, the court necessarily concludes that he has not overcome the presumption of correctness afforded to those findings.  See 28 U.S.C. §§ 2254(d)(2) and (e)(1).  Nor has he demonstrated that either state court's resolution of the federal constitutional issues before it "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).

For the foregoing reasons, as well as those set forth in the respondent's legal memoranda, the respondent's Motion for Summary Judgment (**document no. 24**) and its Supplemental Motion for Summary Judgment (**document no. 33**) are granted. Respondent's Motion to Dismiss Claim Two of the Petition (**document no. 31**) is denied as moot.  Etienne's Amended Petition for a Writ of Habeas Corpus (**document no. 28**) is denied.

The Clerk of Court shall enter judgment in accordance with this order close the case.

Because Etienne has not "made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), the court declines to issue a certificate of appealability. Petitioner may, however, seek such a certificate from the court of appeals under Federal Rule of Appellate Procedure 22(b).  <u>See</u> Rule 11, Federal Rules Governing Section 2254 Cases (2010); 28 U.S.C. § 2253(c).

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

October 21, 2020

cc:  Donna J. Brown, Esq.
     Elizabeth C. Woodcock, Esq.