UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Dickens Etienne,
        Petitioner

        v.                                    Case No. 18-cv-1156-SM
                                              Opinion No. 2023 DNH 138
Michelle Edmark, Warden,
New Hampshire State Prison,
        Respondent

## O R D E R

On January 28, 2004, Dickens Etienne shot an acquaintance, Larry Lemieux, in the back of the head.  Lemieux died almost instantly.  Etienne was tried and a jury convicted him of first-degree murder.  His conviction was affirmed on appeal to the New Hampshire Supreme Court.  He seeks habeas corpus relief from that conviction, asserting that he was denied effective assistance of counsel and claiming the State denied him access to exculpatory information, in violation of his due process rights.

By order dated October 21, 2020, this court granted the State's motion for summary judgment and denied Etienne's habeas corpus petition.  Etienne v. Edmark, No. 18-CV-1156-SM, 2020 WL 6161421, at *1 (D.N.H. Oct. 21, 2020).  In April of this year,

the court of appeals affirmed that decision in part and vacated it in part.  As to Etienne's ineffective assistance of counsel claim, the court of appeals shared this court's conclusion that Etienne failed to demonstrate that trial counsel provided constitutionally deficient representation.  But, as to Etienne's assertion that the State deprived him of constitutionally protected rights when it denied him access to exculpatory information, the court of appeals remanded the matter for further consideration in light of the trial court record (the transcripts of Etienne's eight-day jury trial were not initially presented to this court by either party).  That record has been filed, see docket no. 47, and Etienne's Petition for Certiorari has been denied.  Having reviewed all relevant materials, the court again denies Etienne's petition for habeas corpus relief.

## Standard of Review

The applicable standard of review is fully set out in the court's prior order and need not be repeated.  It is sufficient to note the following: what remains of Etienne's habeas petition turns entirely upon his assertion that the New Hampshire Supreme Court's adjudication of his federal constitutional claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  See

Amended Petition for Writ of Habeas Corpus (document no. 28) at
22 ("The state court's determination of the facts on this issue
is unreasonable . . ..").  A habeas petitioner seeking relief
under that provision faces a substantial hurdle since any
"determination of a factual issue made by a State court shall be
presumed to be correct" and the petitioner must "rebut[] the
presumption of correctness by clear and convincing evidence."
28 U.S.C. § 2254(e)(1).


## Background

The factual backdrop to Etienne's murder conviction is
described in detail in the New Hampshire Supreme Court's
decision affirming his conviction.  See State v. Etienne, 163
N.H. 57 (2011).  In brief, the pertinent facts are as follows.
On January 28 of 2004, Etienne and several other men gathered
outside an apartment on Central Street in Manchester, New
Hampshire.  Two of those men – Lemieux (the victim) and Pierre –
began arguing.  Both men (as well as others, including Etienne)
were armed.  According to the New Hampshire Supreme Court:

> Lemieux [the victim] arrived . . . and walked onto the
> porch with his hands in his pockets.  He approached
> Pierre so they stood face to face, about six inches
> apart. . . . the defendant [Etienne] and [others]
> stood in the area behind Lemieux.  Pierre's gun was in
> his waistband, and [Etienne's] gun was plainly visible
> in his hand.

Witness accounts differed as to what was said next.

* * *

The witnesses all agreed that the defendant [Etienne] and Pierre spoke to each other in Haitian Creole, and then the defendant stepped behind Lemieux, raised his gun, and shot Lemieux in the head behind his right ear.  Lemieux's hands were inside his jacket when he was shot.  He died immediately.

After the shooting, the group dispersed.  The defendant, Pierre and Rivera drove toward Massachusetts.  At some point, while they were still in New Hampshire, Pierre got out of the car.  The defendant and Rivera continued to Rivera's brother's home in Brighton, Massachusetts, where the defendant showered and changed his clothes.  He and Rivera then visited the defendant's sister's home, where he gave her a bag of his soiled clothing and spoke with her about being his alibi for the shooting.  He telephoned [another friend] from a Massachusetts number and told her he was at his sister's home in Boston, and that he had heard about what had happened at the apartment. The defendant left his sister's home at 3 p.m., after approximately twenty minutes there, and drove to the Brighton Reservoir where he threw his gun, magazine and bullets onto the ice.

State v. Etienne, 163 N.H. at 67.  Etienne was indicted for the

murder of Lemieux.  Despite his earlier denials of any

involvement in the shooting, at trial Etienne claimed to have

acted in self-defense as well as in the defense of another –

that is, Pierre (the man with whom the victim, Lemieux, had been

arguing).  Following an eight-day jury trial, Etienne was

convicted of first-degree murder.  He was sentenced to life in

prison, without the possibility of parole.

Etienne appealed to the New Hampshire Supreme Court.  Among the issues he raised was a claim that the State failed to disclose impeachment evidence relating to one of the trial witnesses against him: Jose Gomez.  That impeachment evidence was a letter from the New Hampshire Attorney General's Office, recommending that Gomez receive a suspended sentence on state drug charges unrelated to Etienne's murder case.  The State's failure to disclose that information, said Etienne, violated his constitutionally protected right to due process.

The New Hampshire Supreme Court found that the undisclosed evidence was, indeed, favorable to Etienne.  Nevertheless, the court concluded, "beyond a reasonable doubt, that the evidence would not have altered the outcome because even if the impeachment had caused the jury to disregard Gomez's testimony altogether, there was overwhelming additional evidence of premeditation before the jury."  State v. Etienne, 163 N.H. at 92.  Accordingly, the court held that Etienne's rights under the State and Federal Constitution were not violated in any manner warranting relief.

## Discussion

Etienne's sole remaining claim is the assertion that "his federal constitutional rights were violated when the State

5

withheld favorable impeachment evidence regarding one of the
State's key trial witnesses."  Amended Petition for Writ of
Habeas Corpus (document no. 28) at 1.  As noted above, the
undisclosed evidence was a proffer letter from the New Hampshire
Attorney General's Office, recommending that Jose Gomez (a
witness called by the State in Etienne's murder trial) receive
suspended sentences on unrelated state drug charges, to run
concurrently with each other if imposed, and consecutive to his
sentences on other convictions (three to six years in prison for
falsifying evidence and being a felon in possession).  See State
v. Etienne, 163 N.H. at 87.  See also State v. Etienne, Nos.
2004-0833, 2006-0919, Appellate Brief for the Defendant, 2010 WL
9039205, at 35.

     It probably bears repeating that the proffer letter was not
related in any way to Etienne's murder trial or Gomez's expected
testimony at that trial; it pertained solely to drug trafficking
charges against Gomez and his efforts to reduce his sentence by
sharing with the Manchester Police Department his "knowledge of
illegal drug activities in the Manchester area."  See State v.
Etienne, 163 N.H. at 87.  The letter did not reference Etienne's
murder trial.  The two attorneys from the Attorney General's
Office who were prosecuting Etienne for the murder of Lemieux
were unaware of the letter's existence, id. at 89, and Gomez did

not receive any consideration for his testimony at Etienne's
trial, see State v. Etienne, Nos. 2004-0833, 2006-0919,
Appellate Brief for the Defendant, 2010 WL 9039205, at 36.

The New Hampshire Supreme Court resolved that claim against
Etienne, concluding that although he had shown that the withheld
evidence would have been favorable to his defense (to impeach
Gomez's credibility), such evidence would not have altered the
outcome of the trial:

> We [like the trial court] conclude that the
> undisclosed evidence would not have altered defense
> counsel's strategy, which centered on impeachment of
> Gomez.  We also find, beyond a reasonable doubt, that
> the evidence would not have altered the outcome
> because even if the impeachment had caused the jury to
> disregard Gomez's testimony altogether, there was
> overwhelming additional evidence of premeditation
> before the jury.

Id. at 92.  Etienne disputes that conclusion.  According to
Etienne, the New Hampshire Supreme Court deprived him of his
constitutional rights when it "found that the new impeachment
evidence regarding Gomez was cumulative of other evidence and
the State could have proved premeditation without the testimony
of Gomez."  Amended Petition at 20-21.

The court disagrees.  As the New Hampshire Supreme Court
noted, counsel's efforts to impeach Gomez did not "fail," as

Etienne claims.  Those efforts were quite successful.  The
withheld evidence would have merely bolstered the impeachment of
Gomez.  And, despite Etienne's claim to the contrary, it is
plain that the New Hampshire Supreme Court did not misapprehend
the potential value of the undisclosed impeachment evidence.
Indeed, it recognized that:

> The defense strategy included an argument that Gomez
> was not a credible witness because he had, in all
> likelihood, received a "deal" on his drug charges.
> The defense questioned Gomez extensively about his
> belief that he had received no such deal, established
> the actual sentence Gomez received, and attacked the
> sentence by implying that it was inadequate in light
> of Gomez's criminal history and the charges he had
> been facing.  The defense also argued during its
> closing that Gomez's testimony was not credible
> because he had received an insufficient sentence for
> his drug charges and had become part of the
> prosecution's "team."
>
> The proffer letter, if disclosed, would have provided
> evidence that Gomez had attempted to cooperate with
> the State on the unrelated drug charges, and would
> have supported the defendant's assertion that Gomez
> had allegedly joined the prosecution's team.  It would
> not have established that Gomez received any
> consideration for his testimony at the defendant's
> trial.

State v. Etienne, 163 N.H. at 92.  Overall, the state supreme
court concluded that defense counsel's multi-pronged impeachment
of Gomez was effective and evidence of Gomez's efforts to
cooperate in an unrelated case of his own was only one aspect of
that assault on his credibility:

> The defendant challenged Gomez's credibility in
> several additional respects.  Gomez testified while
> wearing his New Hampshire State Prison clothing and
> fielded questions from both parties about the sentence
> he was serving at the time.  He discussed his actions
> with regard to possessing a firearm and hiding
> Lemieux's gun, the charges leading to his
> imprisonment, as well as the lies he had apparently
> told to police on prior occasions.  <u>Gomez's
> cooperation with the State to receive consideration in
> an unrelated case, therefore, was only one of the
> areas in which the defense attempted to discredit him</u>,
> and the remaining avenues of impeachment were
> unaffected by the undisclosed information.

<u>Id</u>. at 92-93 (emphasis supplied).  Those factual findings and

the conclusion that defense counsel successfully impeached

Gomez's testimony without the benefit of the proffer letter are

amply supported by the record.  <u>See, e.g.</u>, Trial Transcript Day

2, at 227-29 (Gomez discussed "snitches" and explained why he

would never tell the full truth to the police); <u>id</u>. at 230

(Gomez admitted lying to the police about why he went to the

apartment on Central Street); <u>id</u>. at 231-32 (Gomez admitted

lying to the police about why he went upstairs in that

apartment); <u>id</u>. at 236 (Gomez admitted lying to police about

giving his gun to a third party); <u>id</u>. at 238 (reference to

Gomez's arrest on gun and drug charges); <u>id</u>. at 239 (reference

to Gomez's guilty pleas on charges of being a felon in

possession, falsifying physical evidence, and distributing

drugs); <u>id</u>. at 260 (Gomez testified that he believed he had no

"civic duty" to testify truthfully at trial).  <u>See also</u> Defense
Counsel's Cross-Examination of Detective Patti, Trial Transcript
Day 5, at 86-93 (discussing Gomez's eagerness to secure a deal
with the police and his false statements to police); <u>id</u>. at 106-
07 (discussing several reasons Gomez's testimony should be
considered unreliable).

    And, finally, the state supreme court found that, "Gomez's
testimony at trial, while providing some evidence of
premeditation, was not the primary, exclusive, or crucial
evidence on that element. . . [M]any witnesses testified to the
events leading up to the homicide, to the circumstances of the
homicide, and to the defendant's actions thereafter."  <u>State v.
Etienne</u>, 163 N.H. at 93.  Again, those factual findings are
amply supported by the record.  <u>See, e.g.</u>, Testimony of David
"Chico" Garcia, Trial Transcript Day 3, pages 158-90 (describing
the events surrounding the shooting and testifying, among other
things, that Pierre ("Polo") was "very upset" with Etienne
immediately after the shooting – an odd reaction if, as Etienne
claimed, he had acted in defense of Pierre and just saved his
life); Testimony of Tina Gobis, Trial Transcript Day 4, page 26
(testifying that Lemieux admitted to her that he had called
Etienne a "bitch ass niggar," he was on his way to Central
Street to meet Etienne, and that Etienne had threatened to kill

him); Testimony of Jenna Battistelli, Trial Transcript Day 4, pages 75-79 (testifying that she overheard a conversation between Etienne and Pierre, during which one of them said the victim, Lemieux, would "get his some day"); Testimony of Israel Rivera, Trial Transcript Day 4, pages 254-55 (testifying that when Etienne shot Lemieux, the only person he could see on the porch who was visibly displaying a weapon was Etienne); id. at 258 (although Lemieux had his hands in his pockets, it was not threatening and did not make Rivera nervous); Testimony of Latorre Johnson, Trial Transcript Day 5, pages 251, 257-59 (testifying that Lemieux's hands were in his pockets when defendant moved behind him and shot him in the head). See generally Testimony of Cameo Jette, Trial Transcript Day 6, pages 101-207 (demonstrating Etienne's consciousness of guilt by presenting threatening letters he wrote to various potential witnesses after he obtained and reviewed their police statements).

The state court's factual findings are fully supported by the record. While Etienne plainly disagrees with some, if not all of those findings, he has not rebutted the presumption of correctness afforded to those findings by clear and convincing evidence. Necessarily, then, Claim 2 of his petition fails.

## Conclusion

Etienne's habeas corpus claim is, in essence, an effort to relitigate factual findings that were resolved against him by the New Hampshire Supreme Court.  Having reviewed the record, transcripts, and the arguments advanced by counsel, the court necessarily again concludes that he has not overcome the presumption of correctness afforded to those findings.  See 28 U.S.C. §§ 2254(d)(2) and (e)(1).

For the foregoing reasons, as well as those set out in the respondent's legal memoranda, the respondent's Motion for Summary Judgment (**document no. 24**) and its Supplemental Motion for Summary Judgment (**document no. 33**) are granted. Respondent's Motion to Dismiss Claim Two of the Petition (**document no. 31**) is denied as moot.  Etienne's Amended Petition for a Writ of Habeas Corpus (**document no. 28**) is denied.

The Clerk of Court shall enter judgment in accordance with this order close the case.

Because Etienne has not made "a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), the court declines to issue a certificate of appealability.

Petitioner may, however, seek such a certificate from the court of appeals under Federal Rule of Appellate Procedure 22(b).  <u>See</u> Rule 11, Federal Rules Governing Section 2254 Cases (2010); 28 U.S.C. § 2253(c).

      **SO ORDERED.**

                                             Steven J. McAuliffe
                                             United States District Judge

November 2, 2023

cc:  Donna J. Brown, Esq.
     Elizabeth C. Woodcock, Esq.